IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
*Newport News Division*

| | |
|---|---|
| UNITED STATES OF AMERICA )<br>)<br>v.                                                      )<br>)<br>JOHN MAGOBET,                           )<br>)<br>Defendant.                                    ) | Case No.:   4:23CR20 |

### **DEFENDANT'S POSITION WITH RESPECT TO SENTENCING FACTORS**

The defendant, John Magobet, by counsel, pursuant to Section 6A1.2 of the *Sentencing Guidelines and Policy Statements* and the Court's Sentencing Procedures Order, respectfully states that he has reviewed the Presentence Investigation Report ("PSR"), he does not have any objections to the PSR and he respectfully states his position with respect to the sentencing factors.

Mr. Magobet is before this Honorable Court for sentencing following his guilty plea to Counts 1, 4 and 9, of the Criminal Indictment charging him with the following:

**Count 1**: Dealing Firearms without a License, in violation of 18 U.S.C. § 922(a)(1)(A), a Class D Felony (Not more than 5 years imprisonment, $250,000 fine, and $100 special assessment);
**Count 4**: Make a False Statement During Purchase of a Firearm, in violation of 18 U.S.C. §§ 922(a)(6), 924(a)(2), and 2, a Class C Felony (Not more than 10 years imprisonment, $250,000 fine, and $100 special assessment); and
**Count 9**: Possession of a Firearm with Serial Number Removed, Obliterated, or Altered, in violation 18 U.S.C. § 922(k), a Class D Felony (Not more than 5 years imprisonment, $250,000 fine, and $100 special assessment).

### **Overview of Sentencing Request**

Mr. Magobet is a fifty-eight-year-old man who exercised extremely poor judgment when he engaged in the criminal conduct that brings him before this Honorable Court. Sadly, Mr. Magobet will be a federally convicted felon, a label he never thought would be associated with his name.

After discussing the case and reviewing the discovery with counsel, Mr. Magobet almost immediately communicated his desire to plead guilty and defense counsel timely communicated Mr. Magobet's desire to plead guilty to the Government. Very shortly after said communication, Mr. Magobet's case was scheduled for a guilty plea hearing before the Honorable Robert J. Krask, United States Magistrate Judge, for May 17, 2023. ECF Nos. 13-19.

Mr. Magobet has accepted full responsibility for his criminal behavior, thereby allowing the Government and this Honorable Court to allocate their resources most efficiently. Mr. Magobet's advisory sentencing guideline range is 57 to 71 months of confinement. Mr. Magobet respectfully requests that this Honorable Court impose a sentence below the advisory guideline range as the sentence recommended by the advisory sentencing guideline range is greater than necessary to comply with the sentencing factors of 18 U.S.C. § 3553(a). Specifically, the defense requests a sentence of twenty-four (24) months of incarceration within the Bureau of Prisons, 5 years of Supervised Release, and a $300 Special Assessment.

## The Appropriate Sentence in this Case

In determining Mr. Magobet's sentence, this Honorable Court is to consider:

(1) the nature and circumstances of the offense and the history and characteristics of Mr. Magobet;

(2) the need for the sentence imposed—

    (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

    (B) to afford adequate deterrence to criminal conduct;

    (C) to protect the public from further crimes of Mr. Magobet; and

>> (D) to provide Mr. Magobet with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

> (3) the kinds of sentences available;

> (4) the kinds of sentences and the sentencing range established for the offense;

> (5) any pertinent policy issued by the Sentencing Commission;

> (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

> (7) the need to provide restitution to any victims of the offense.

*See* 18 U.S.C. § 3553(a). Neither the statute itself nor *United States v. Booker*, 543 U.S. 220 (2005), suggests that any one of these factors is to be given greater weight than any other factor. Pursuant to 18 U.S.C. 3553(a), this Honorable Court is required to impose a sentence that is sufficient, but not greater than necessary, to comply with the above factors.

## The History and Characteristics of the Mr. Magobet

A. Mr. Magobet's Age, Coupled with his Medical Diagnoses Support a Below Guidelines Sentence

John Magobet is 58 years of age, and he suffers from myriad medical issues, for which he has been prescribed numerous medications. PSR ¶¶ 64-67. He was born and raised in Philadelphia, Pennsylvania, to the marital union of his parents. His upbringing was negatively impacted by a number of different factors, including his mother's history of mental health illness and lack of parental supervision when he was young. Specifically, Mr. Magobet "reported he did not have adequate adult supervision during his childhood due to his older siblings supervising him while his parents were at work. The defendant advised he was mostly provided with the basic necessities during his childhood; however, he noted there was a week or two long period when the gas

to the house was shut off and described not receiving the love and nurturing, he needed. He also described the family as not having 'togetherness.'" PSR ¶ 53.

While Mr. Magobet did not report a history of physical or sexual abuse, "he believed he was mentally abused by his mother. He indicated that it was difficult for him to deal with her multiple personalities and recalled times when she would tell him she hated him. The defendant conveyed he received discipline in the form of spankings." PSR ¶ 54.

Unfortunately, a turning point in Mr. Magobet's life took place after he and two other individuals robbed a pizzeria when he was a juvenile. "After he was caught, 3 days later, he was placed in foster care for approximately 6-7 months. He noted the foster family provided him with love and affection that he did not receive from his actual family. The defendant advised he was ordered to attend Sleighton Farm School, a reformatory school, previously located in Glen Mills, Pennsylvania, for one year. The defendant reported he was given an assessment and placed in a transition house. He described the experience as positive and noted he was the student body president for the facility, went on a trip to Disney World, and made the honor roll." PSR ¶ 55.

Tragically, during a weekend visit with his family, Mr. Magobet "advised upon returning home he witnessed his father in the midst of a suicide attempt via shooting himself in the head. He conveyed that his father had a shotgun barrel inside his mouth. The defendant advised the event induced an immense amount of stress and that he developed a bleeding ulcer. He recalled he was hospitalized at Delaware County Memorial Hospital, located in Drexel Hill, Pennsylvania. The defendant reported he was unable to return to the reformatory school right away which resulted in his enrollment at Sleighton Farm School being extended." PSR ¶ 56.

After his release from reformatory school, at 16 years old, Mr. Magobet, "recalled when he returned home his mother had left his father for a younger man, and his father had begun using drugs and alcohol. The defendant advised his youngest brother was engaged in narcotics trafficking as well.

The defendant attributed his family's decline to him beginning to use cocaine and trafficking narcotics." PSR ¶ 57.

Mr. Magobet "advised he began a relationship with an 18-year-old woman, Constance Adomiz, when he was 16 years old, and the union produced his oldest son, Justin Allen Magobet, born on March 24, 1988. The defendant recalled he and Constance began using drugs and that he lost his job and lost custody of Justin for a period. He reported the couple's drug use led to Constance stealing his work issued firearm when he was working as a supermarket security guard. The defendant advised he sought guidance from his brother who advised him to contact the Pennsylvania Department of Human Services (DHS). He indicated DHS took custody of Justin and placed him in the state's foster care system. The defendant reported after he lost custody of his child, he began attending Narcotics Anonymous, ended the relationship with the child's mother, obtained new employment as a maintenance worker, and maintained a period of sobriety from in or around 1994 to 2009. The defendant conveyed he regained custody of his son, Justin Magobet, in or around 1995 when the child was 4 years old. The defendant reported Constance Adomiz, 'got her act together' and took custody of their son. The defendant reported his son, Justin Magobet, age 34 resides with his mother in West Philadelphia, Pennsylvania." PSR ¶ 60.

Mr. Magobet married his wife, Jennifer Magobet, in Philadelphia, Pennsylvania, in 1997, and three children were born to his marriage. His oldest son, Antonio Magobet, is currently a member of the United States Navy, "and is stationed in Norfolk, Virginia. Antonio owns the house the family lives in. The defendant's daughter, Shannon Magobet, age 24, resides in Hampton, Virginia. The defendant's son, A.M., age 13, resides in Hampton, Virginia. The defendant advised his youngest son, is diagnosed with autism. The defendant reported his wife is his son's caregiver, and he is enrolled in a school that addresses his special needs." PSR ¶ 61.

B.  Physical Condition:

Mr. Magobet has a significant history of medical health issues and is on myriad prescription medications to treat the same.   PSR ¶¶ 64-67.

C.  Mental and Emotional Health:

Mr. Magobet has a long-standing history of mental health issues and he could benefit from continued mental health treatment and counseling.   PSR ¶¶ 69-73.

D.  Substance Abuse:

Mr. Magobet "reported he abused alcohol as a teenager, and he only consumes alcohol 'once in a blue moon' as an adult. The defendant reported he first used marijuana when he was approximately 12 years old, and he occasionally used marijuana until he was 22 years old. The defendant reported he first used cocaine when he was approximately 16 years old and continued to use cocaine regularly until he was approximately 24 years old, sporadically until he was approximately 38 years old, used regularly in or around 2009 and then regularly from 2017 to 2020." PSR ¶¶ 74-77.

A "review of United States Probation Office records revealed that on April 4, 2023, the defendant reported to the United States Probation Officer who is assigned his pretrial supervision, that he attended outpatient substance abuse treatment in 2009. The defendant advised he was confident he could abstain from further drug use and described his drug use as 'recreational.' The defendant was referred to The Counseling Center, LLC, (TCC) to undergo a substance abuse assessment on May 8, 2023. According to records received from TCC, the defendant reported he first used cocaine base at 16 years old, and he has continued to use it 'off and on' since then. He was diagnosed with 'Stimulant Use Disorder, (cocaine)(Moderate).' TCC recommended the defendant complete a 12-week abstinence-based substance abuse program which consisted of weekly cognitive behavioral group sessions. The program was scheduled to begin on May 18, 2023, and completed on August 3, 2023. The August 2023 monthly treatment reported from TCC reflects the defendant has attended 12 groups

and been absent 4 times as of August 31, 2023, and his new projected completion date as September 28, 2023." PSR ¶ 77. Clearly Mr. Magobet is in desperate need of continued substance abuse treatment and co-occurring therapy with wrap-around services to treat his history of mental health and substance abuse issues.

    E.  Employment:

Mr. Magobet has a long-stranding history of lawful and gainful employment in the maintenance technician field. PSR ¶¶ 85-101.

### The Nature and Circumstances of the Offense

The PSR sufficiently details the criminal conduct which brings Mr. Magobet before this Honorable Court. PSR ¶¶ 12-21. In retrospect, Mr. Magobet knows that he exercised extremely poor judgment by unlawfully selling firearms. When confronted by law enforcement, Mr. Magobet was cooperative with the investigation and timely notified the government of his intention to plead guilty and accept responsibility for his criminal behavior.

### Seriousness of the Offense/Promoting Respect for the Law/Providing Just Punishment

The defense respectfully submits that a sentence of twenty-four (24) months, 5 years of Supervised Release, and a $300 Special Assessment would reflect the seriousness of the offense and promote respect for the law considering Mr. Magobet's minimal and dated criminal history, his cooperation in this case and the unlikelihood that he will violate the law in this manner again in the future. In addition, he is now a federally convicted felon, a label with which he will forever be branded. These collateral consequences will follow Mr. Magobet for the rest of his life and thus will be continuing punishment to him.

**Deterrence & Protecting the Public from Mr. Magobet**

**Deterrence:**

A sentence of twenty-four (24) months, 5 years of Supervised Release, and a $300 Special Assessment, is sufficient to achieve general and special deterrence. Research indicates that increases in the *severity* of punishment are far less important to producing deterrent effects than the *certainty* of punishment (if severity is relevant at all). *See* Wright, *Deterrence in Criminal Justice: Evaluating Certainty vs. Severity of Punishment*, 1. Indeed, virtually no empirical data suggests that harsher (more lengthy) sentences achieve better general deterrence than moderate sentences. After reviewing the available evidence on whether harsher sentences deter, Professor Doob asked and answered the following question:

> Can we conclude that variation in the severity of sentences would have differential (general) deterrent effects? Our reply is a resounding no. We could find no conclusive evidence that supports the hypothesis that harsher sentences reduce crime through the mechanism of general deterrence. Particularly given the significant body of literature from which this conclusion is based, the consistency of the findings over time and space, and the multiple measures and methods employed in the research conducted, we would suggest that a stronger conclusion is warranted. More specialally, the null hypothesis that variation in sentence severity does not cause variation in crime rates should be conditionally accepted.

Anthony N. Doob & Cheryl Marie Webster, *Sentence Severity and Crime: Accepting the Null Hypothesis*, 30 Crime & Just. 143, 187 (2003). Indeed, "[t]he findings regarding general deterrence are relatively settled":

> The existing data show that in the absence of the threat of punishment for criminal conduct, the social fabric of society would readily dissipate; crime would escalate and overwhelmingly frustrate the capacity of people to lead happy and fulfilled lives. Thus, general deterrence works in the absolute sense: there is *a connection* between criminal sanctions and criminal conduct. However, there is insufficient evidence to support a direct correlation between higher penalties and a reduction in the crime

> rate…. It is counter-intuitive to suggest that higher penalties will not reduce the crime rate. However, the evidence is relatively definitive.

Mirko Bagaric, *A Rational Theory of Mitigation and Aggravation in Sentencing: Why Less Is More When It Comes to Punishing Criminals*, 62 Buff. L. Rev. 1159, 1202-03 (2014) (footnotes omitted). In sum, "studies repeatedly show that awareness of potentially severe sanctions does not produce less crime." *Id.*, at 1203. So general deterrence "does not require a particularly burdensome penalty, merely one that people would seek to avoid," which "could be satisfied by a fine or a short prison term." *Id.* at 1205.

Deterrence is especially important in a case such as this, especially given the culture relative to gun safety and control in the United States of America. A sentence of twenty-four (24) months, 5 years of Supervise Release, and a $300 Special Assessment sends a strong and serious message to Mr. Magobet as it relates to specific deterrence and also to the public as it relates to general deterrence.

Accordingly, there is simply no reasonable basis upon which to conclude that a sentence of twenty-four (24) months, 5 years of Supervised Release, and a $300 Special Assessment will not afford deterrence.

### The Kinds of Sentences Available/Sentence Recommended by the Guidelines

The statutory range of punishment on Counts 1 and 9 is a period of incarceration of no more than five (5) years, and on Count 4, a period of incarceration of no more than ten (10) years. The advisory guideline range recommends imprisonment from 57 to 71 months. Of course, the guideline range is advisory and but one factor for this Honorable Court to consider when deciding upon the appropriate punishment pursuant to 18 U.S.C. § 3553(a). As noted earlier in this pleading, the defense submits that the guideline range in this particular case, as applied to Mr.

Magobet, is excessive and greater than necessary.

### Providing Educational/Vocational Training or Medical Care/Correctional Treatment

Mr. Magobet certainly is in need of medical treatment, and he could greatly benefit from co-occurring treatment and therapy to address his significant history of mental health and substance abuse issues.

### Avoiding Unwarranted Sentencing Disparities

This Honorable Court must consider the need to avoid unwarranted disparities among defendants with similar criminal histories convicted of similar criminal conduct. 18 U.S.C. § 3553(a)(6). This Honorable court should avoid unwarranted similarities in sentencing among defendants who are different in ways not accounted for in the guideline range. *See Gall*, 552 U.S. at 55 ("need to avoid unwarranted *similarities* among other co-conspirators who were not similarly situated"). Mr. Magobet's case, history, characteristics, and similar case characteristics, warrant a sentence below the guideline range and that would not result in any unwarranted sentence disparities.

In the case of the *United States v. Julio Pino*, 2:17CR70, (E.D. Va. Mar. 5, 2019) (Doumar, J.) Mr. Pino pleaded guilty to Interstate Transfer of a Firearm and received a sentence of 30 months to serve in the Bureau of Prisons.

The Statement of Facts in Mr. Pino's case indicates that "[f]rom on or about November 6, 2015, to in or about January 21, 2017, in Norfolk, within the Eastern District of Virginia, and elsewhere, the defendant, JULIO FERNANDO PINO, not being a licensed dealer of firearms within the meaning of Chapter 44, Title 18, United States Code, willfully engaged in the business of dealing firearms by using his military discount to purchase and resell firearms at a profit.

Specifically, he purchased at least 60 firearms, posted 146 times on firearms-marketplace website www.VAguntrader.com, advertised at least 50 firearms on firearms-marketplace website www.armslist.com, and resold at least 23 firearms at a profit."   2:17CR70, ECF No. 21.

While each case consists of its own unique facts and circumstances, the *Pino* case is of interest to note and compare to Mr. Magobet's case, especially in light of the extended duration of time in which Mr. Pino engaged in the illegal transfer of firearms and the sheer quantity of firearms that were involved.   Mr. Pino "bought and re-sold firearms so many times that, unsurprisingly, he sold some firearms to prohibited people, including a juvenile, a drug-addicted armed robber, a drug dealer trafficking in stolen firearms, and many others."   2:17CR70, ECF No. 34 Pgs. 3-4.   Additionally, "[d]uring his firearms-trafficking scheme, he lied on military exchange Form 4473s at least thirteen times and also lied to law enforcement."   *Id*. at 5.

Mr. Pino was in his early twenties at the time of the offenses, he had no prior criminal record, and he was a member of the United States Navy.   His Criminal History Category was a I, and his advisory guideline range was 87-108 months.   ECF No. 35, Pgs. 1, 2-3.

Understanding the similarities and differences between each case, and the fact that every case is again, unique in its own right, counsel submits that a review of the facts and the disposition in the *Pino* case is helpful in determining what sentence is sufficient, but not greater than necessary in Mr. Magobet's case.

In Mr. Pino's case, the duration of the criminal conduct was extensive as were the number of firearms that were illegally transferred.   In comparison, in Mr. Magobet's case, the duration of the criminal conduct was significantly less, as were the number of firearms that were illegally sold.   Additionally, the advisory guideline range in Mr. Pino's case was significantly higher than in Mr.

Magobet's case, and Mr. Pino received a sentence of 30 months; a sentence that was 57 months below the low-end of the advisory sentencing guideline range.

Without question, Mr. Magobet engaged in serious criminal conduct, which undoubtedly warrants punishment. Counsel submits that an analysis, and a contrast and comparison between Mr. Magobet's case and Mr. Pino's case may be helpful and informative in Mr. Magobet's case in determining a sentence that is sufficient, but not greater than necessary to achieve the sentencing factors as set forth in 18 U.S.C. § 3553(a).

## Conclusion

Mr. Magobet respectfully requests that this Honorable Court give consideration to the foregoing factors and find that a sentence anywhere within or close to the advisory guideline range would be overly harsh and greater than necessary. Accordingly, in light of the statutory factors and arguments above, Mr. Magobet respectfully asserts that a sentence of twenty-four (24) months of incarceration be imposed, 5 years of Supervised Release, and a $300 Special Assessment. Additionally, Mr. Magobet respectfully requests that this Honorable Court recommend to the Bureau of Prisons that he be incarcerated in a prison as close as possible to the Tidewater region of the Commonwealth of Virginia. Finally, Mr. Magobet respectfully requests that this Honorable Court authorize a self-surrender to the designated Bureau of Prisons facility of approximately 30 days.

Respectfully Submitted,

JOHN MAGOBET

By: _____/s/_____
Kirsten R. Kmet
Virginia State Bar No. 47786
Assistant Federal Public Defender

Attorney for Defendant John Magobet
Office of the Federal Public Defender
500 East Main Street, Suite 500
Norfolk, Virginia 23510
Telephone: 757-457-0850
Facsimile: 757-457-0880
Email: kirsten_kmet@fd.org

## **CERTIFICATE OF SERVICE**

I hereby certify that on the 27th day of October 2023, I will file the foregoing with the Clerk of Court, and mail a true and correct copy to the following:

>Devon E.A. Heath, Esquire
>Assistant United States Attorney
>United States Attorney's Office
>Fountain Plaza Three
>721 Lakefront Commons, Suite 300
>Newport News, Virginia 23606
>Email: devon.heath@usdoj.gov

I further certify that a true and correct copy of the foregoing document has been sent by electronic mail to following non-user:

>Joshua A. Coleman
>Senior United States Probation Officer
>United States Probation Office
>600 Granby Street, Suite 200
>Norfolk, Virginia 23510
>Email: Joshua_coleman@vaep.uscourts.gov

>_____/s/_____
>Kirsten R. Kmet
>Virginia State Bar No. 47786
>Assistant Federal Public Defender
>Attorney for John Magobet
>Office of the Federal Public Defender
>500 East Main Street, Suite 500
>Norfolk, Virginia 23510
>Telephone: 757-457-0850
>Facsimile57-0880
>Email: kirsten_kmet@fd.org